# EXHIBIT A

1  Robert W. Dickerson (State Bar No. 089,367)
   rwdickerson@jonesday.com
2  Michael A. Tomasulo (State Bar No. 179,389)
   matomasulo@jonesday.com
3  Anna E. Raimer (State Bar No. 234,794)
   aeraimer@jonesday.com
4  Alexandria L. Dominguez (State Bar No. 235,950)
   aldominguez@jonesday.com
5  JONES DAY
   555 South Flower Street
6  Fiftieth Floor
   Los Angeles, CA  90071-2300
7  Telephone:  (213) 489-3939
   Facsimile:   (213) 243-2539
8
   Attorneys for Plaintiff
9  ACTIVISION PUBLISHING, INC.

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  ACTIVISION PUBLISHING,            Case No. CV07-0074
    INC., a Delaware corporation,
14                                    COMPLAINT FOR:
           Plaintiff,
15                                    1)  COPYRIGHT INFRINGEMENT,
        v.                            2)  LANHAM ACT VIOLATION,
16                                    3)  VIOLATION OF COMPUTER
    JOHN TAM, an individual, JAMIE        FRAUD AND ABUSE ACT,
17  YANG, an individual, COREY        4)  VIOLATION OF CALIFORNIA
    FONG, an individual, DOUG             PENAL CODE § 502,
18  KENNEDY, an individual, HONG      5)  MISAPPROPRIATION OF
    YIP LOW, an individual,               TRADE SECRETS,
19  RAYMOND YOW, an individual,       6)  MISAPPROPRIATION OF
    REVERB COMMUNICATIONS,                CONFIDENTIAL
20  INC., a California corporation, and   INFORMATION
    THE ANT COMMANDOS, INC., a       7)  BREACH OF CONTRACT,
21  California corporation,           8)  BREACH OF FIDUCIARY
                                          DUTY AND DUTY OF
22         Defendants.                    LOYALTY,
                                      9)  INTERFERENCE WITH
23                                        CONTRACTUAL RELATIONS,
                                      10) INTERFERENCE WITH
24                                        PROSPECTIVE ECONOMIC
                                          ADVANTAGE,
25                                    11) STATUTORY UNFAIR
                                          COMPETITION,
26                                    12) COMMON-LAW UNFAIR
                                          COMPETITION, AND
27                                    13) CONVERSION.

28                                    DEMAND FOR JURY TRIAL

LAI-2841100v3

1

2    Plaintiff Activision Publishing, Inc. ("Activision") files this Complaint

3  against Defendants John Tam, Jamie Yang, Corey Fong, Doug Kennedy, Hong Yip

4  Low, Raymond Yow, Reverb Communications, Inc. and The Ant Commandos, Inc.

5  (collectively "Defendants") and alleges as follows:

6

7                        **NATURE OF THE CASE**

8        1.    Activision is a leading international publisher of interactive

9  entertainment software products.  Among its many successful products, Activision

10 presently markets and sells the award-winning rhythm based music games called

11 Guitar Hero™ and Guitar Hero II™.  Guitar Hero™ and Guitar Hero II™

12 (collectively the "Guitar Hero™ franchise ") allow users to emulate rock stars by

13 playing a custom guitar-shaped controller to rock 'n roll songs.

14       2.    Activision has just discovered that three Activision employees (John

15 Tam, Jamie Yang, Corey Fong), an outside consulting firm long retained by

16 Activision and its key employee (Reverb Communications, Inc., Doug Kennedy)

17 have been working with one of Activision's main competitors (The Ant

18 Commandos, Inc.) and its President, Hong Yip Low, and its Director of Marketing,

19 Raymond Yow, to steal Activision's confidential and trade secret information,

20 infringe Activision's copyrights, and generally compete unfairly with Activision.

21 Defendants have engaged in a series of deliberate, unlawful and unfair acts, all

22 designed to gain an unfair and unearned presence in the market for rhythm based

23 music games.  Instead of creating their own unique game, and independently

24 accumulating and developing the financial and marketing information and research

25 required to market and sell that game, Defendants copied Activision's Guitar

26 Hero™ franchise  and misappropriated Activision's trade secrets and confidential

27

28

LAI-2841100v3

-2-

1  information with the intent of creating and selling their own guitar game

2  ("Defendants' Game") and thereby unfairly compete with Activision.

3      3.      Based on Defendants' improper acts, Activision brings this action for

4  copyright infringement, violation of Section 43(a) of the Lanham Act, violation of

5  the Computer Fraud and Abuse Act, violation of California Penal Code § 502,

6  misappropriation of trade secrets, misappropriation of confidential information,

7  breach of contract, breach of duty of loyalty and fiduciary duty, interference with

8  contractual relations, interference with prospective economic advantage, statutory

9  and common-law unfair competition and conversion.

10      4.      As a result of Defendants' unlawful conduct, Activision has suffered

11  and, unless Defendants are enjoined, will continue to suffer irreparable injury.

12  Activision therefore seeks injunctive relief, compensatory and punitive damages

13  and other relief.

14

15                      **JURISDICTION AND VENUE**

16      5.      The first and second claims for relief are for copyright infringement,

17  which arises under 17 U.S.C. § 501, *et seq.*, and violation of Section 43(a) of the

18  Lanham Act, 15 U.S.C. § 1125(a).  This court has original subject matter

19  jurisdiction pursuant to the provisions of 28 U.S.C. §§ 1331 and 1338(a) and 15

20  U.S.C. § 1121(a).

21      6.      The third claim for relief is for violation of the Computer Fraud and

22  Abuse Act, 18 U.S.C. § 1030, *et seq.*  This court has original subject matter

23  jurisdiction over this claim pursuant to 18 U.S.C. § 1030(g).

24      7.      This Court has supplemental jurisdiction over Plaintiff's fourth

25  through thirteenth causes of action under 28 U.S.C. § 1367(a).  These claims are so

26  related to the other claims in this case over which this Court has original

27

28

1    jurisdiction that they form a part of the same case or controversy under Article III

2    of the United States Constitution.

3         8.    Venue is proper under 28 U.S.C. § 1391(b)(2) since a substantial part

4    of the events giving rise to the claims occurred in this district. Venue is also proper

5    in this district under 28 U.S.C. § 1391(b)(1) since all defendants reside in

6    California, defendants Fong, Tam and Yang effectively reside in this judicial

7    district in that they have each agreed in contracts signed with Plaintiff that litigation

8    between them and Plaintiff could and would be brought in this judicial district

9    (specifically, in Los Angeles, CA), and this litigation in part arises out of and is

10   related to those contracts, and defendant The Ant Commandos, Inc., resides in this

11   judicial district.

12

13                              **THE PARTIES**

14        9.    Plaintiff Activision is a Delaware corporation, having its principal

15   place of business at 3100 Ocean Park Boulevard, Santa Monica, California 90405.

16        10.   Defendant John Tam ("Tam"), an individual, was until recently an

17   employee of Activision who resides in Milpitas, California.

18        11.   Defendant Jamie Yang ("Yang"), an individual, was until recently an

19   employee of Activision who resides in San Jose, California.

20        12.   Defendant Corey Fong ("Fong"), an individual, was until recently an

21   employee of Activision who resides in Foster City, California.

22        13.   Defendant Doug Kennedy ("Kennedy"), an individual, is Vice

23   President of defendant Reverb Communications, Inc. and a former independent

24   contractor for Activision who is located in Twain Harte, California.

25        14.   Defendant Reverb Communications, Inc. ("Reverb") is a California

26   corporation having its principal place of business at 18711 Tiffeni Drive, Suite K,

27   Twain Harte, California 95383. Upon information and belief, Kennedy may be the

28

LAI-2841100v3                           - 4 -

1  alter ego of Reverb, and vice versa. Kennedy, on information and belief,

2  authorized, directed and/or participated in the acts herein alleged.

3      15.    Defendant The Ant Commandos ("TAC") is a California corporation,

4  having its principal place of business at 13521 Benson Avenue, Chino, California

5  91710.

6      16.    Defendant Hong Yip Low ("Low"), an individual, resides in Fremont,

7  California and is President of TAC. Low, on information and belief, authorized,

8  directed and/or participated in the acts herein alleged.

9      17.    Defendant Raymond Yow ("Yow"), an individual, is Director of

10  Marketing of TAC and, upon information and belief, resides in California. Yow,

11  on information and belief, authorized, directed and/or participated in the acts herein

12  alleged.

13

14  **BACKGROUND FACTS**

15      18.    Activision has been an innovator and leader in the development,

16  marketing and sale of interactive entertainment software products. Activision

17  maintains a diverse portfolio of products that spans a wide range of categories and

18  target markets and can be used on a variety of game hardware platforms and

19  operating systems. Activision's products have been widely advertised and sold

20  throughout the United States and the world for over 25 years.

21      19.    In May 2006, Activision entered into an agreement to acquire video

22  game publisher RedOctane, Inc. ("RedOctane"), which became a wholly-owned

23  subsidiary of Activision in June 2006. RedOctane opened in 1999 as the world's

24  first online game rental service and later became a publisher, developer and

25  distributor of interactive entertainment software, hardware and accessories.

26      20.    RedOctane launched the original Guitar Hero™ video game in retail

27  stores across the United States in November 2005. The Guitar Hero™ games are

28

LAI-2841100v3

1    sold with a controller in the shape of the world famous Gibson® SG guitar (the "SG
2    Controller"). The SG Controller was designed to look and feel like a modified
3    electric guitar and is used by a Guitar Hero™ player to control the game play.
4          21.    When it publicly announced the development of the Guitar Hero™
5    video game, RedOctane described Guitar Hero™ as:
6              a guitar simulation game that puts you at the center of your very own
7              rock band. By pressing down on fret buttons on a specially designed
8              guitar controller, players can form notes and chords to be played by
9              strumming in time on a 'strum bar' representing the strings of an
10             electric guitar. These notes and chords are represented onscreen by
11             scrolling note markers. Using button combinations, sustains and the
12             whammy bar, players will experience the essence of what it's like to
13             actually play some of the coolest rock songs of all time. Players can
14             choose from multiple rock characters and play at concert venues that
15             grow in size as your rock career progresses.
16         22.    In the United States, Activision distributes its products, such as the
17    Guitar Hero™ games, through mass retailers like Best Buy, Fry's, Target and Wal-
18    Mart, through specialty retailers such as GameStop and EB Games, and through
19    Internet retailers.
20
21    **The Guitar Hero™ Video Game Sweeps the Industry and the Nation**
22         23.    Demos of an early prototype of Guitar Hero™ debuted at the May
23    2005 Electronic Entertainment Expo ("E3"), where Guitar Hero™ won
24    GameSpot's "Best of E3 2005" award in the Puzzle/Rhythm game category. The
25    game also earned the accolades "Best of Show" and "Editor's Choice" from entities
26    covering the 2005 E3 trade show. Thereafter, Guitar Hero™ began generating
27    great notoriety within the video game industry, and among consumers.
28

LAI-2841100v3

24.    As the development and renown of Guitar Hero™ progressed, RedOctane continued to promote the game at trade shows, through the Internet and other marketing channels. More accolades and other unsolicited positive coverage of the game followed. At the October 2005 Digital Life event, which was a multi-day event featuring technology from a variety of industries and attended by over 50,000 consumers and 3,000 press, analysts and retailers, Guitar Hero™ received the award "Best of Show" in the Game Hardware category. Guitar Hero™ was also awarded Best Soundtrack by Spike TV's "Video Game Awards 2005," and garnered the awards "Best Offline Multiplayer Game 2005" and "Music Game of the Year 2005" from IGN.com.

25.    Coverage of the Guitar Hero™ game in publications and other media increased and produced further rave reviews:

- "With its extremely smart approach to difficulty, its great guitar controller, and its killer song selection, Guitar Hero might just be the best rhythm game ever made." *Gamespot.*

- "All your dreams of being a rock star will come true with one of the greatest music games of all time." *Yahoo Games.*

- "Truth be told, 1UP recently held a group 'review' session that lasted late into the night. After a few beers, some leaps off the couch, about 8 renditions of Boston, countless moments of faux-rockstar posturing, and actually stomping so hard that we broke the disc during the thundering finale of 'Take Me Out,' everyone seemed to agree on a score for Guitar Hero. But our scale only goes up to 10." *1UP.com.*

- "When it really comes down to it, what this game's about is no-frills rocking. And no-frills rocking is something it does very, very well. More, please." *Official PlayStation Magazine.*

1    26.    By the time that the game was released for sale to the public in

2  November 2005, Guitar Hero™ had already received substantial media, industry

3  and public attention. The game's public release only increased that attention.

4    27.    On February 14, 2006, RedOctane announced that it had been honored

5  by the Academy of Interactive Arts and Sciences (AIAS) at the 9th annual D.I.C.E.

6  Summit Interactive Achievement Awards in Las Vegas. Guitar Hero™ won five

7  awards, including: Outstanding Innovation in Gaming, Outstanding Achievement

8  in Soundtrack, Outstanding Achievement in Game Play Engineering, Outstanding

9  Achievement in Game Design and Family Game of the Year.

10    28.    Then, on June 7, 2006, RedOctane announced that Guitar Hero™ had

11  been honored by PC World as one of the "100 Best Products of 2006," coming in

12  19th out of the 100 "Best Products." No other video game was even included on

13  the list. To create its best products list, PC World evaluates each product over the

14  last 12 months based on exemplary design and usability, features, performance,

15  innovation and specifications.

16    29.    Since its initial efforts at the 2005 E3 show, RedOctane, and later

17  Activision, have extensively promoted the Guitar Hero™ franchise through print

18  advertisements, in-store demonstrations, radio promotions and demonstrations at

19  various trade shows. As illustrated above, the game has also received substantial

20  promotion through positive reviews in gaming magazines and countless other

21  unsolicited accolades and recognition. Gibson Guitars and MTV have also

22  promoted the Guitar Hero™ games during events and in television and Internet

23  promotions. Plaintiffs have thus expended substantial amounts of time and money

24  publishing, distributing and marketing the Guitar Hero™ franchise .

25    30.    Not only has the Guitar Hero™ franchise been a critical success, it has

26  also been a sales success. By January 2007, more than 2 million copies of the

27  Guitar Hero™ and Guitar Hero II™ video games had been sold worldwide.

28

LA1-2841100v3                  - 8 -

1    Further, by January 2007, over 40,000 SG Controllers were sold separately from

2    the Guitar Hero™ video game for use by players as an additional controller.

3

4    **TAC, How TAC Competes With Activision, and The Value of Certain**

5        **Misappropriated Information To TAC**

6        31.    Since its launch, Guitar Hero has turned into something of a cult

7    phenomenon, and can now be deemed a bona fide mass-market hit. This success

8    has created a piggy-back market for third party manufacturers of peripheral devices

9    to the game, such as alternate guitar controllers. Since Guitar Hero can be played

10   by more than one person at the same time, Activision not only sells a "game

11   bundle" which includes the game and the guitar controller, but also sells stand-

12   alone guitar controllers for use with the Guitar Hero game. Thus, third party

13   manufacturers of controllers compete directly with Activision for sales of stand-

14   alone guitar controllers that are compatible with the Guitar Hero game.

15       32.    TAC was one of the first companies to launch a line of guitar

16   controller peripherals for the Guitar Hero game. Because TAC used screen shots of

17   the copyrighted Guitar Hero game on its packaging and made other unfair use of

18   Activision's intellectual property rights in connection with its marketing of its

19   controllers, Activision and RedOctane were forced to file suit against TAC for

20   trademark infringement, copyright infringement and unfair competition. The

21   parties settled that lawsuit and it was dismissed on December 20, 2006.

22       33.    Of course, a third party guitar controller can only work with the Guitar

23   Hero game if it is compatible with the software for the game. Thus, for a third

24   party manufacturer to introduce a compatible guitar controller, it typically would

25   have to wait until the Activision product was commercially available and then

26   reverse engineer the product to design a controller compatible with the Activision

27   game. The process of reverse engineering and copying the Activision controller to

28   design a competing controller obviously takes some time, and costs a substantial

LAI-2841100v3

- 9 -

1  amount of money. In the video game market, time to market is an important

2  component of commercial success, and competitors try to be first to market. Thus,

3  a manufacturer of third party guitar controllers such as TAC would stand to gain

4  financially if it could gain access to Activision proprietary information regarding

5  unreleased Guitar Hero products. Such access would reduce (or eliminate) the time

6  and expense of reverse engineering the products, and would provide a huge head

7  start into the market, allowing near immediate competition with Activision for the

8  sale of stand-alone guitar controllers.

9      34.    One of the reasons that Activision is so concerned about the

10  information theft by Defendants is that the Activision employees involved in this

11  theft are intimately familiar with and currently still have in their possession

12  proprietary and confidential design specifications for Activision's newest, and as

13  yet unreleased, Guitar Hero game and controller, which Activision is making for

14  the Microsoft Xbox 360™ game console. This information would be extremely

15  valuable to TAC (and other competitors) because it would allow TAC to introduce

16  a competing guitar controller much earlier than TAC could have otherwise done so,

17  perhaps even close to the launch date of Activision's new product.

18

19  **Background on Defendants**

20      35.    Upon information and belief, at least as early as October 2006, while

21  Defendants Tam, Yang, Fong and Kennedy were employed by Activision,

22  Defendants secretly agreed amongst themselves to set up a business that would

23  directly compete with Activision, and they conspired to do so using Activision's

24  confidential and trade secret information and other resources in flagrant breach of

25  their contracts with and duties to Activision. In furtherance of the conspiracy,

26  Defendants among other things:

27  •      used Activision resources to develop a demo for Defendants' Game, which

28         will purportedly be used with the installed controller base of Guitar Hero™;

LAI-2841100v3

1      •      prepared a PowerPoint presentation of their proposed new company which

2             they intended to use to attract investors and potential buyers of their game;

3      •      prepared sales and cost projections for Defendants' Game based on

4             Activision's confidential and trade secret sales and cost information for

5             Guitar Hero II™;

6      •      intended to target and/or partner with a major third party (because the identity

7             of this third party is confidential, it will be referred to hereinafter as "the

8             Third Party") for development and promotion of their game even though the

9             name of the Third Party and the details of its proposed involvement with the

10            expansion and promotion of the Guitar Hero™ franchise  were and still are

11            confidential and trade secret information of Activision;

12     •      while Activision and TAC were negotiating a settlement of their lawsuit

13            mentioned above, Yang communicated with TAC with the intent of

14            benefiting TAC rather than Activision;

15     •      stole countless Activision proprietary computer files;

16     •      lied and/or were evasive when Activision attempted to discuss these matters

17            with each of them; and

18     •      refused to turn over all Activision materials despite their obligations to do so

19            and despite Activision's demands that they do so.

20            36.    Defendants Tam, Yang and Fong are former employees of Activision

21     (collectively the "Former Employees") who played significant roles in the

22     development and marketing of the Guitar Hero™ games for Activision and its now

23     wholly-owned subsidiary RedOctane.

24            37.    Of the approximately 30 employees working at RedOctane when it

25     was acquired by Activision, Tam and Yang were two of only four employees

26     designated as "key" employees by Activision.  Because it was important to

27     Activision that certain people working on the software and hardware of

28     RedOctane's games continued their employment with Activision, certain

LAI-2841100v3

1    incentives, such as stock options and higher salaries, were offered to key employees

2    in exchange for their agreement to work for Activision for at least one year.

3        38.    Thus, in connection with the acquisition, Yang and Tam both entered

4    into written employment contracts with Activision, in the form of countersigned

5    letters dated June 1, 2006, with Tam as a "Senior Producer" and Yang as a "Product

6    Manager." The agreements provided that the initial terms would commence in June

7    2006 and expire May 31, 2007. During that time, Yang and Tam agreed not to

8    work for any competitor of Activision.

9        39.    Though he did not enter into a fixed term contract, Fong was offered

10   and accepted similar incentives to join Activision as a "Brand Manager." The

11   terms of his employment were memorialized in a letter dated June 6, 2006.

12       40.    The Former Employees each signed agreements not to disclose

13   confidential and trade secret information of Activision. These agreements were

14   entitled "Employee Proprietary Information Agreement." The Former Employees

15   also each signed agreements to abide by the policies in Activision's Employee

16   Handbook, which further prohibits the improper use and disclosure of Activision's

17   confidential and trade secret information. Each of the Former Employees also

18   signed an Acknowledgement of Receipt, noting that the Former Employees read

19   and understood the policies contained in the Employee Handbook.

20       41.    Defendant Kennedy is the Vice President of Business Development at

21   Reverb. By a written agreement between RedOctane and Reverb dated March 2,

22   2006, Kennedy agreed to serve as the Vice President of Sales of RedOctane, and his

23   partner, Tracie Snitker, agreed to serve as the Director of Public Relations of

24   RedOctane. From about March 2006 to August 11, 2006, Kennedy served as Vice

25   President of Sales, first for RedOctane and then, after the acquisition, for

26   Activision. In this position, Kennedy assisted Activision with sales efforts for the

27   Guitar Hero™ franchise and also had access to Activision's confidential and trade

28   secret information.

LA1-2841100v3

42.    TAC is a competitor of Activision that markets and distributes accessories designed for use with the Guitar Hero™ franchise. TAC also designs and distributes peripherals and accessories for the interactive entertainment industry.

43.    Upon information and belief, Tam, Yang, Fong and Kennedy have accepted employment with or have indicated their intent to accept employment with TAC and are using Activision's trade secrets and confidential information to assist with the creation, marketing and sale of Defendants' Game by TAC.

**Tam's Role at Activision and His Improper Conduct**

44.    As a Senior Producer for Activision, Tam managed the software production of several Activision interactive video games, including Guitar Hero™ and Guitar Hero II™. Tam oversaw Guitar Hero™, Guitar Hero II™ and other games from their conception to the point at which the owners of the platforms on which the games were played, including Sony and Microsoft, approved the games for use on their platforms.

45.    In his capacity as Senior Producer, Tam had knowledge of the features in Activision's video games, Activision's future software and hardware development plans and the budgets for each Activision product. Tam had access to software demos and software in development by Activision. Tam also knew the rosters and head counts for each of the software development teams, including the number of animators and engineers needed for the production of the games. Tam had access to and helped negotiate some of the music licensing and in-game advertising agreements for Guitar Hero™ and Guitar Hero II™, and he therefore knew such confidential and trade secret information as the amount Activision paid for the licenses, the terms and conditions of the licenses and how they were obtained. Tam also served as Design Lead on the Guitar Hero™ SG Controller and assisted with the development of other controllers.

46.   Tam's final project was the Xbox 360™ version of Guitar Hero II™ which is still underway. On December 11, 2006, Tam unexpectedly indicated that he wanted to resign from Activision. Because Tam was under contract, because he had not given any prior indication of his intent to leave and because he did not provide plausible reasons for leaving, Activision became suspicious with respect to his true reason for resigning.

47.   Because of that suspicion, Activision advised Tam that Tam's work computer at Activision would be searched, to which Tam voiced no objection. This search revealed that Tam, Fong, Yang, Kennedy and TAC had been conspiring to form a company, referred to as Hourglass Interactive and then, ultimately, Lodestone Entertainment, Inc., to compete with Activision using Activision's confidential and proprietary information. (Hereinafter, Defendants' contemplated business venture is referred to as "Lodestone").

48.   As the true story behind Tam's resignation began to unfold, Tam's improper acts while still an employee at Activision were revealed. For example, executives at Activision learned that Tam had been using Activision's resources to develop a demo for the Defendants' Game (a Guitar Hero™ type project) that was not authorized by Activision, and which Defendants intended to use to compete with Activision's products.

49.   In the fall of 2006, Tam sought and received approval from his superiors at Activision to incur the expense for new software ostensibly to assist with internal functions for Guitar Hero™. Independent contractors were hired to complete the software development project, and Mark Johnson, an Activision employee on Tam's team, worked with Tam on the project. After the contractors reached the first of four milestones to complete the software, Activision paid them the agreed upon amount.

50.   It was later discovered that Activision's resources had not been used to create new software for internal functions as Tam had claimed, but instead, Tam

LAI-2841100v3

- 14 -

1  directed Mark Johnson to use the work product of the contractors to develop a

2  demo of Defendants' Game (the "Tam Demo") for Tam. It was clear that the Tam

3  Demo was made for Tam's (and the other Defendants') personal gain, rather than

4  for Activision's use, because the basic musical genre of the current version of the

5  Guitar Hero™ franchise was changed and because Tam instructed Johnson not to

6  show the version of the demo that included the changed musical genre to

7  Activision's senior management.

8      51.    Presently, Guitar Hero™ includes rock 'n roll songs by artists such as

9  AC/DC, Ozzy Osbourne and David Bowie. The Tam Demo contained songs by

10  artists popular with a younger audience, and was consistent with Defendants' stated

11  plan to target the Third Party. Mark Johnson revealed that Tam had given

12  instructions that the demo be created using the Third Party's songs and live videos

13  by artists affiliated with that Third Party. Though Activision had discussed

14  internally, and Tam was aware, of Activision's intent to target this Third Party for

15  future projects relating to the Guitar Hero™ franchise, such a project was not yet in

16  the current development schedule for Guitar Hero™ when the Tam Demo was

17  created. Similarly, while RedOctane had contemplated using a different

18  background (as in the Tam Demo) as an alternative backdrop in future Guitar

19  Hero™ games, such was not yet approved for inclusion on the software

20  development project. Therefore, although both were Activision's internal,

21  confidential and trade secret marketing and expansion plans for the Guitar Hero™

22  franchise, the development work by Johnson and the independent contractors hired

23  by Tam (at Activision's expense) was clearly for Tam's benefit (and that of his co-

24  conspirators), not for Activision. Tam and his co-conspirators were secretly and

25  actively co-opting Activision's planned development and expansion for the Guitar

26  Hero™ franchise for themselves.

27      52.    Correspondence obtained from Tam's work computer confirmed that

28  Tam and the other Defendants were planning to pitch a product to the Third Party

LAI-2841\00v3

1    based on the Tam Demo. For example, John Tam wrote an email to Raymond Yow

2    of TAC on December 3, 2006, that he planned to "talk with all the partners with the

3    first key game and to show the ruff demo that I have already prepared." Thus, in

4    furtherance of their conspiracy against Activision, the Defendants decided to target

5    and/or partner with the Third Party. The Defendants' decision to target that Third

6    Party was plainly based on confidential and trade secret information contained in

7    Activision's plans for the Guitar Hero™ franchise .

8         53.    Defendants Kennedy and TAC's president, Low, have admitted

9    viewing the Tam Demo, which was given to them by Tam.

10

11   **Fong's Role at Activision and His Improper Conversion of Activision Files**

12        54.    At RedOctane, and later at Activision, Fong was responsible for

13   creating and implementing the marketing plans for the Guitar Hero™ franchise .

14   Fong was also involved in all aspects of Activision's marketing in his role,

15   including but not limited to producing a marketing budget for and forecasting sales

16   of Guitar Hero™ products for Activision. Obviously, such information is highly

17   sensitive, confidential and trade secret information.

18        55.    While working for Activision, Fong had access to the server

19   containing Activision's proprietary information, including financial and marketing

20   information for Guitar Hero™. The server also holds all of Activision's business

21   development and product development files related to the business of RedOctane.

22   Access to Activision's server requires a certain login to protect the confidential and

23   trade secret information contained on the server.

24        56.    Following the search of Tam's computer and the revelation that Fong

25   was also involved in the conspiracy against Activision, Fong's work computer at

26   Activision was searched. This search revealed that at least as early as October

27   2006, Fong had converted Activision's confidential and trade secret information,

28   including the Guitar Hero II™ budget, the Guitar Hero II™ 360 strategic plan and

1   the Guitar Hero II™ forecast of variable sales and marketing expenses, by sending

2   this information from his email account at Activision to his personal Yahoo

3   account. Fong proceeded to use the information in those documents to develop the

4   business plan for Lodestone, including creating P&Ls, sales forecasts and

5   marketing plans. As will be discussed in greater detail below, the co-conspirators

6   had warned one another not to engage in email discussion regarding their plans for

7   the new company using Activision's email network, and had agreed to use their

8   personal internet services for that purpose, thus clearly evincing their knowledge

9   that what they were doing was wrong and illegal, and showing that their wrongful

10  conduct was intentional, malicious and willful.

11      57.    Other email correspondence from Fong to his conspirators showed he

12  was also sharing with his co-conspirator's Activision's confidential and trade secret

13  information regarding its licensing agreements with music companies.

14      58.    Additionally, on December 21, 2006, Fong was observed copying,

15  upon information and belief, a large volume of Activision's computer files onto a

16  white iPod for well over an hour. Fong left at the close of the business day with the

17  iPod in his possession. Fong had no work-related reason for copying large volumes

18  of Activision's files onto an iPod. Upon information and belief, Fong was illegally

19  copying Activision's proprietary information to use in furtherance of his plans for

20  Lodestone.

21

22  **Yang's Role at Activision and Her Unlawful Acts**

23      59.    As a Product Manager at Activision, Yang's primary responsibilities

24  included working with manufacturing, sourcing, product design and logistical

25  planning for the Guitar Hero™ franchise . Yang also worked on Guitar Hero™

26  controllers and is a named inventor on patent applications for these controllers.

27      60.    Yang had access to Activision's confidential and trade secret

28  information including, but not limited to: (a) samples of a new Guitar Hero II™,

1    Xbox 360, controller, the internal workings of which are confidential and trade
2    secrets of Activision; (b) past sales and future sales forecasts; (c) production
3    schedules and logistics, such as the number of Guitar Hero™ controllers that were
4    being built and shipped at each manufacturing plant; (d) future design plans and
5    new features for Activision products; and (e) vendor information, including
6    information regarding vendor identities and contacts, contract terms and pricing.
7        61.    Of great concern, Yang currently retains a vast amount of highly
8    confidential Activision information, which would be extremely valuable to TAC
9    and Lodestone (or any other Activision competitor).  Yang forwarded many
10   proprietary documents to her personal e-mail account managed by Yahoo!.  Indeed,
11   a forensic search of her work computer at Activision indicates that Yang has an
12   enormous volume of proprietary Activision information stored in her personal
13   Yahoo! Account.  For instance, she has "folders" in her personal email account
14   called "RO email-OLD," "ROemail," and, of particular concern "Xbox 360."  The
15   RO folders, on information and belief, contain RedOctane emails, and the Xbox
16   360 folder, on information and belief, contains Activision proprietary information
17   regarding the as-yet-unreleased Guitar Hero hardware and software for the
18   Microsoft Xbox 360™ game console.  Importantly, Yang has failed to return all of
19   Activision's materials and confidential information to Activision, despite
20   Activision's requests and her obligations to do so.  Activision has spent a
21   substantial amount of time and money developing an Xbox 360™ controller, which
22   is due for release in Spring 2007.  Obtaining the electronics in Activision's
23   controller before its release would provide competitors such at TAC and Lodestone
24   with a much desired cost savings and head start in reverse engineering and
25   attempting to create a competing guitar controller.
26       62.    The search conducted on the Former Employees' computers revealed
27   that Yang had also been sharing her knowledge of Activision's confidential and
28   trade secret sourcing costs and manufacturing information with TAC.  Specifically,

LAI-2841100v3

1  in an email to Tam and Fong, Yang states that she and Yip Low of TAC "talked

2  about China sourcing and hardware/factories..."

3     63.    Upon information and belief, Yang also assisted TAC in negotiating a

4  settlement to a previous lawsuit in which Activision sued them for, among other

5  things, trademark infringement, copyright infringement and unfair competition.

6  Upon information and belief, Yang helped Low in these negotiations by providing

7  him with inside confidential and trade secret information about Activision's

8  strategies for settlement of the case.

9

10  **Kennedy's Role at Activision and His Improper Conduct**

11     64.    As Vice President of Sales of RedOctane, Kennedy knew Activision's

12  confidential and trade secret information regarding the identity of Activision's

13  customers and the prices customers paid for Activision products, as well as

14  customer purchase history, comments and feedback.  Kennedy also had knowledge

15  of Activision's distributors, the contact information of retailers and the terms of

16  distribution, all of which is confidential and trade secret information.  Kennedy also

17  had information regarding all aspects of Activision's sales, including sales

18  forecasts.

19     65.    Kennedy also negotiated various business deals for Activision and the

20  Guitar Hero™ franchise .  For example, Kennedy was privy to negotiations with

21  GamerGraphics, which originally approached Activision for business and later

22  made a deal with TAC.

23     66.    On January 4, 2007, a press release announced that Reverb

24  Communications was hired to oversee marketing and public relations for TAC.

25  The press release further revealed that Doug Kennedy was appointed to the Board

26  of Directors of TAC.

27     67.    The email correspondence recovered from the Former Employees'

28  computers demonstrates Kennedy and Reverb's involvement in the conspiracy to

LAI-2841100v3

- 19 -

1  usurp Activision's business using Activision employees and Activision confidential

2  and trade secret information for TAC and Lodestone. For instance, as noted above,

3  Kennedy and Reverb are copied on numerous emails referencing Activision's

4  confidential and trade secret information related to Guitar Hero, such as cost and

5  sales forecast information.

6

7  **TAC's Role in the Conspiracy**

8       68.   Upon information and belief, TAC was intentionally involved in this

9  conspiracy, encouraging Defendants to misappropriate Activision's confidential

10  and trade secret information for TAC's benefit in its role as the principal

11  shareholder in Lodestone.

12       69.   The forensic search of the Former Employees' computers showed that

13  Raymond Yow and Low of TAC had been continuously corresponding with the

14  Former Employees while they were employed by Activision, speaking to them on

15  the phone, discussing their role in Lodestone via email and during dinners with

16  them, and even leasing space for them to work.

17       70.   Upon information and belief, TAC encouraged the Former Employees

18  to prematurely terminate their contractual relationships with Activision and

19  misappropriate Activision's confidential and trade secret information for TAC's

20  and Lodestone's benefit. The attainment of Activision's confidential and trade

21  secret information allows TAC to unfairly compete with Activision by gaining

22  knowledge about Activision's product design prior to the product's release, as well

23  as providing them with the financial and marketing know-how to launch and

24  distribute a successful video game product, TAC's business experience having

25  therebefore been limited to guitar controller peripherals rather than to video game

26  products themselves, including software.

27

28

**Summary**

71.    Upon information and belief, each of the Defendants has played a separate and important role in the conspiracy to misappropriate Activision's confidential and trade secret information and create a competing video game business:  Tam ordered a demo of Defendants' Game to be produced using Activision's resources; Fong took the marketing and financial information for Guitar Hero II™ to create the cost model and financials for Defendants' Game; Yang provided information related to Activision's manufacturing and sourcing to assist with creating compatible hardware for play on Defendants' Game; and Kennedy, Reverb, TAC, Low and Yow provided the incentives and resources for all of these improper acts, and stood to gain by them.

72.    When interviewed by Activision's representatives investigating this matter, the Former Employees repeatedly lied when asked about their involvement, deals and dealings with the other co-conspirators.  Furthermore, in spite of Activision's requests that all of the conspirators return all materials to Activision and informally agree to cease all of their illicit activities, none of the conspirators returned any materials or otherwise agreed to cease all of their illicit activities.


**FIRST CLAIM FOR RELIEF**

(Copyright Infringement – 17 U.S.C. § 501, *et seq.*)

(Against All Defendants)

73.    Activision repeats, realleges, and incorporates by reference, as though fully set forth herein, the allegations contained in all preceding and subsequent paragraphs.

74.    Activision is the owner of the copyright in the audiovisual material associated with the game Guitar Hero™.  This material constitutes original, copyrightable subject matter under the laws of the United States.

LAI-2841100v3

- 21 -

1  75.   Activision applied for, obtained and is the owner of Certificate of

2  Registration PA-1-322-764 for Guitar Hero™. This copyright is valid and

3  enforceable throughout the United States. A copy of the Certificate of Registration

4  is attached hereto as **EXHIBIT A** and incorporated herein by reference.

5  76.   After Guitar Hero™ was created, and without the consent of

6  Activision, Defendants created the Tam Demo, which was copied from and is

7  substantially similar to Guitar Hero™. Attached hereto as **EXHIBIT B** are screen

8  shots from Guitar Hero™ and, upon information and belief, also from the Tam

9  Demo, which illustrate the substantial similarity in the audiovisual content of the

10  two games. All of the Defendants had access to Activision's copyrighted material.

11  77.   Defendants, with full knowledge of Activision's rights, violated and

12  infringed Activision's copyrights by performing or having performed for them the

13  acts of reproducing, displaying, publishing, distributing, selling and/or promoting

14  the Tam Demo, which contains material copied from and substantially similar to the

15  Guitar Hero™ video game, without Activision's authorization or consent.

16  78.   The above-recited acts by Defendants constitute copyright

17  infringement of Activision's federally registered copyright in violation of the

18  Copyright Act, 17 U.S.C. § 501(a), to the substantial and irreparable injury of

19  Activision.

20  79.   Upon information and belief, as a result of the acts of Defendants,

21  Defendants have been and will continue to be unjustly enriched by profits that

22  Defendants have made and will make in connection with the creation and marketing

23  of Defendants' Game.

24  80.   Upon information and belief, as a result of the acts of Defendants,

25  Activision has suffered and will continue to suffer monetary damages in an amount

26  not yet determined. Additionally, Activision has incurred and will incur liability

27  for costs and attorneys' fees.

28

LAI-2841100v3

81.    Upon information and belief, Defendants' acts were in conscious and willful disregard for Activision's rights.

82.    Activision lacks an adequate remedy at law. Unless Defendants are restrained and enjoined by this Court, Defendants' actions will continue to cause irreparable harm and injury to Activision.

## SECOND CLAIM FOR RELIEF

(Violation of Section 43(a) of the Lanham Act - 15 U.S.C. § 1125(a))

(Against All Defendants)

83.    Activision repeats, realleges and incorporates by reference, as though fully set out herein, the allegations contained in all preceding and subsequent paragraphs.

84.    Defendants' conduct complained of herein constitutes Unfair Competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

85.    Activision has been seriously and irreparably damaged as a result of Defendants' unlawful conduct and will continue to be seriously and irreparably damaged unless Defendants' conduct is enjoined.

86.    Upon information and belief, as a result of the acts of Defendants, Activision has suffered and will continue to suffer monetary damages in an amount not yet determined. Additionally, Activision has incurred and will incur liability for costs and attorneys' fees.

87.    Defendants' conduct complained of herein was intentional, malicious and willful.

88.    Unless Defendants are restrained and enjoined by this Court, Defendants' actions will continue to cause irreparable harm and injury to Activision.

LA1-2841100v3

### THIRD CLAIM FOR RELIEF

(Violation of Computer Fraud and Abuse Act –

18 U.S.C. §§ 1030(a)(4) and (a)(5)(B))

(Against All Defendants)

89.    Activision repeats, realleges and incorporates by reference, as though fully set out herein, the allegations contained in all preceding and subsequent paragraphs.

90.    Fong exceeded his authorized access to a protected computer at Activision when, as aforesaid, he intentionally accessed and sent confidential Activision information from his work computer to his personal Yahoo account and when he copied Activision's files onto his iPod, all without authorization from Activision.

91.    In so doing, Fong acted knowingly and with the intent, and with the effect, of furthering a fraudulent scheme to misappropriate confidential and trade secret information of Activision and divert that information to a competitive use injurious to Activision.

92.    In so doing, Fong, upon information and belief, caused impairment of the integrity and/or availability of data or information on the protected computer so accessed.

93.    Upon information and belief, as a result of the acts of Fong, Activision has suffered and will continue to suffer monetary damages during a one-year period in excess of $5,000 for, among other things, the amount of business lost by Fong's misappropriation and use of Activision's computer files and the expenses paid for retaining a forensic expert to determine what information was taken by Fong.

94.    Fong's actions constitute a violation of 18 U.S.C. § 1030(a)(4) and (a)(5)(B).

95.    Activision is entitled to compensation for these damages pursuant to 18 U.S.C. § 1030(g).

LAI-2841100v3

96.    Fong's actions were committed in the course of and in furtherance of a conspiracy among the Defendants to misappropriate Activision's confidential and trade secret information to the benefit of their competing enterprise; and Fong's co-conspirators therefore are jointly and severally liable with him for the damage caused by his aforesaid unauthorized access.

## FOURTH CLAIM FOR RELIEF

(Civil Liability for Violation of California Penal Code § 502)

(Against All Defendants)

97.    Activision repeats, realleges and incorporates by reference, as though fully set out herein, the allegations contained in all preceding and subsequent paragraphs.

98.    Under California Penal Code § 502(c), it is considered a public offense when a person:

- Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. Cal. Penal Code § 502(c)(1).

- Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

- Knowingly and without permission uses or causes to be used computer services. Cal. Penal Code § 502(c)(3).

LAI-2841100v3

- 25 -

99.   Defendant Fong knowingly accessed and without permission used a computer at Activision and made copies of files thereon to execute his scheme to defraud Activision and wrongfully obtain its confidential and trade secret information.

100.   Defendant Tam knowingly caused Activision to use computer services to create the Tam Demo without authorization or permission from Activision.

101.   As a result of the aforementioned acts, Defendants Tam and Fong have violated California Penal Code § 502.

102.   Fong's and Tam's actions were committed in the course of and in furtherance of a conspiracy among the Defendants to misappropriate Activision's confidential and trade secret information to the benefit of their competing enterprise; and their co-conspirators therefore are jointly and severally liable with them for the damage caused by their aforesaid acts in violation of California Penal Code § 502.

103.   Based on Defendants' acts and pursuant to California Penal Code § 502(e)(1), Activision is entitled to recover compensatory damages in an amount to be proven at trial, as well as injunctive relief, against the Defendants.  Additionally, Activision has incurred and will incur liability for costs and attorneys' fees recoverable under California Penal Code § 502(e)(2).

104.   Furthermore, Defendants' conduct was willful and in furtherance of their conspiracy to defraud Activision of its confidential and trade secret information, justifying the award of punitive damages pursuant to California Penal Code § 502(e)(4).

///

## FIFTH CLAIM FOR RELIEF

(Misappropriation of Trade Secrets -- Cal. Civil Code §§ 3426, *et seq.*)

(Against All Defendants)

105.   Activision repeats, realleges and incorporates by reference, as though fully set out herein, the allegations contained in all preceding and subsequent paragraphs.

106.   Activision has a proprietary interest in its confidential and trade secret information ("Activision Proprietary Information"), which includes, but is not limited to:

(a)    Financial information related to the Guitar Hero™ franchise , including but not limited to, profit and loss information, cost information, expenses, contract terms, sales numbers and forecasts, information contained in the Guitar Hero II™ Budget Summary, information contained in the Guitar Hero II™ North American Xbox 360™ Strategy PowerPoint, and information contained in the Variable Sales & Marketing spreadsheet;

(b)    Marketing information related to the Guitar Hero™ franchise , including but not limited to marketing partners, contract terms, marketing categories, information contained in the Guitar Hero™ franchise plans, identified growth areas for the Guitar Hero™ franchise ,

(c)    Product information related to the Guitar Hero™ franchise , including but not limited to product design, such as the design for the Guitar Hero II™ Xbox 360™ controller design, future product ideas and designs,

(d)    Information related to music licensing and in game advertising for the Guitar Hero™ franchise , including but not limited to contract terms, identities of possible future songs and artists to include;

(e)    The identity of the Third Party and Activision's plans for expansion of the Guitar Hero™ franchise in connection with Third Party; and

1         (f)   Vendor information related to the Guitar Hero™ franchise ,

2 including but not limited to vendor identities and contact lists, vendor pricing,

3 contract terms.

4       107.  Specifically, as set forth in Activision's Proprietary Information

5 Agreement that was signed by Tam, Yang and Fong, Activision Proprietary

6 Information:

7         shall mean any and all trade secrets, confidential knowledge, data or

8         any other proprietary information pertaining to any business of the

9         Company or any of its clients, customers or consultants, licensees or

10        affiliates. By way of illustration but not limitation, "Proprietary

11        Information" includes (a) inventions, ideas, improvements,

12        discoveries, trade secrets, processes, data, programs, knowledge,

13        know-how, designs, techniques, formulas, test data, computer code,

14        other works of authorship and designs whether or not patentable,

15        copyrightable, or otherwise protected by law, and whether or not

16        conceived of or prepared by [you], either alone or jointly with others

17        (hereinafter collectively referred to as "Inventions"); (b) information

18        regarding research, development, new products and services,

19        marketing plans and strategies, merchandising and selling, business

20        plans, strategies, forecasts, projections, profits, investments,

21        operations, financings, records, budgets and unpublished financial

22        statements, licenses, prices and costs, suppliers and customers; and (c)

23        identity, requirements, preferences, practices and methods of doing

24        business of specific parties with whom the Company transacts

25        business, and information regarding the skills and compensation of

26        other employees of the Company and independent contractors

27        performing services for the Company.

28

108.   The Activision Proprietary Information includes trade secrets that derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

109.   Activision has taken reasonable measures to protect the secrecy of the Activision trade secrets and to prevent its unauthorized disclosure by taking security measures, including but not limited to: password protection for all information stored on Activision's server; an external firewall; employment policies requiring employees to keep all Activision information confidential and prohibiting the removal of confidential and proprietary information from Activision without authorization; the requirement that employees sign proprietary information agreements prohibiting them from disclosing confidential and trade secret information from Activision without authorization; non-disclosure agreements with vendors; and security measures on the premises of the Activision and RedOctane facilities.

110.   Despite having no valid interest or right to possess or use Activision Proprietary Information, including trade secrets, outside of Activision, Defendants acquired, used, disclosed and/or removed Activision trade secrets through improper means and/or knew or should have known that they acquired such through improper means or from persons who owed a duty to maintain their secrecy.

111.   As a result of the acts of Defendants, Activision has suffered damages in amount to be determined at trial pursuant to California Civil Code § 3426.3.

112.   Based on Defendants' willful and malicious misappropriation of Activision's trade secrets, Activision is also entitled to exemplary damages and attorneys' fees pursuant to California Civil Code §§ 3426.3(c) and 3426.4.

113.   Unless Defendants are restrained and enjoined by this Court, Defendants' actions will continue to cause irreparable harm and injury to Activision, justifying an injunction pursuant to California Civil Code § 3426.2(a).

LAI-2841100v3

# SIXTH CLAIM FOR RELIEF

## (Misappropriation of Confidential Information)

### (Against All Defendants)

114.   Activision repeats, realleges and incorporates by reference, as though fully set out herein, the allegations contained in all preceding and subsequent paragraphs.

115.   The Activision Proprietary Information includes confidential information Activision developed through a substantial investment of time and money.

116.   To the extent to which Activision confidential information was imparted by Activision to Tam, Yang and Fong, it was imparted to them in confidence, and was voluntarily received by them in confidence, with the understanding that it was not to be disclosed to others, and was not to be used by Tam, Yang and Fong for purposes beyond the limits of Activision's permission.

117.   Tam, Yang and Fong, at little or no cost to themselves, misappropriated confidential information that had been imparted to them in confidence, disclosed such information to the other Defendants, and used such information and allowed the other Defendants to use it for purposes that all Defendants knew, or should have known, were competitively injurious to Activision and beyond the limits of the confidence in which Activision had imparted the Information to Tam, Yang and Fong.

118.   By misappropriating Activision confidential information as aforesaid despite their duty to recognize, respect and maintain its confidentiality, Defendants have inflicted damages upon Activision, in an amount to be determined at trial.

119.   Based on Defendants' willful and malicious misappropriation of Activision's Proprietary Information, Activision is also entitled to exemplary damages and attorneys' fees.

1    120.  Unless Defendants are restrained and enjoined by this Court,

2    Defendants' actions will continue to cause irreparable harm and injury to

3    Activision, justifying an injunction.

4

5                        **SEVENTH CLAIM FOR RELIEF**

6                             (Breach of Contract)

7                          (Against Tam, Yang and Fong)

8    121.  Activision repeats, realleges and incorporates by reference, as though

9    fully set out herein, the allegations contained in all preceding and subsequent

10   paragraphs.

11   122.  A valid and binding contract currently exists between Activision and

12   Tam.  A valid and binding contract also exists between Activision and Yang.  These

13   contracts require that, among other things, the term of Tam and Yang's

14   employment continue until May 31, 2007, and that during that time they not work

15   for any Activision competitor.

16   123.  In exchange for adequate consideration, Tam, Yang and Fong signed

17   an agreement entitled "Employee Proprietary Information Agreement," which

18   requires them to keep Activision's information confidential and not disclose trade

19   secret information.  By signing this agreement, Tam, Yang and Fong, specifically

20   agreed:

21   • to "hold in strictest confidence and not to disclose, make any use

22   of, except for the benefit of the Company, lecture upon or

23   publish, at any time either during the term of or subsequent to

24   [their] employment, any [Activision] Proprietary Information

25   ..." (Proprietary Information Agreement ¶ 1);

26   • "not to deliver, reproduce or in any way allow such Proprietary

27   Information, or any documentation relating to such information,

28   to be delivered or used by any third parties without the specific

written direction or consent of a duly authorized representative of the Company." (Proprietary Information Agreement ¶ 1);

- that all original works of authorship "produced, developed or authored by [them] (whether alone or jointly with others), or otherwise resulting from [their] work within the scope of [their] employment" belong solely to Activision, either under the work for hire doctrine or by assignment. (Proprietary Information Agreement ¶ 3);

- that Activision had sole and exclusive ownership of all Inventions "made, learned or conceived by [them] (whether alone or jointly with others) during the period of [their] employment with the Company which relate in any manner at the time of conception to the actual or demonstrably anticipated research or product development by the Company or to its business, or result from or are suggested by any task assigned to [them] or any work performed by [them] for or on behalf of the Company." (Proprietary Information Agreement ¶ 5);

- "that all files, accounts, records, materials, documents, drawings, sketches, designs, diagrams, models, blueprints, plans, specifications, manuals, books, forms, receipts, notes, reports, memoranda, studies, data, calculations, recordings, catalogues, compilations of information, correspondence and all copies, abstracts and summaries of the foregoing, instruments, tools and equipment and all other physical items related to the Company or to [their] employment with the Company, other than merely personal items, whether of a public nature or not, and whether prepared by [them] or not, are and shall remain the sole and

exclusive property of the Company and shall not be removed from the premises of the Company, except as required in the course of employment by the Company, without prior written consent of the Company in each instance." (Proprietary Information Agreement ¶ 10); and

- that during their employment with Activision, they "will not engage in any other employment, occupation, consulting or other activity relating to the business in which the Company is engaged, or which would otherwise conflict with [their] obligations to the Company." (Proprietary Information Agreement ¶ 12).

124.    Tam, Yang and Fong further agreed that, in addition to other remedies, Activision "shall be entitled to a temporary restraining order, and to temporary and permanent injunctive relief, to prevent or terminate [an] anticipated or actual breach [of this agreement]...." (Proprietary Information Agreement ¶ 14).

125.    Both Tam and Yang breached their employment agreements by resigning from Activision and accepting employment with TAC prior to the May 31, 2007 expiry of the contracts.

126.    Tam, Yang and Fong breached the Proprietary Information Agreement by:

(a)    disclosing and using Activision's proprietary information for their own personal benefit and the benefit of others;

(b)    reproducing Activision's proprietary information and allowing it to be used by third parties without Activision's consent;

(c)    producing and developing works and other inventions within the scope of their employment and at Activision's expense for their own use and benefit and the use and benefit of others;

LAI-2841100v3

- 33 -

(d)    removing files, materials, designs, plans, data, and other documents and physical items from Activision and its vendors' premises without consent;

(e)    soliciting other Activision employees to leave Activision;

(f)    working on the Lodestone plans and/or with TAC while still employed by Activision; and

(g)    engaging in other activity that relates to Activision's business and conflicts with their obligations to Activision.

127.   Tam, Yang and Fong also breached written agreements to abide by the Activision Employee Handbook, the receipt of which they each acknowledged in writing and which they each agreed in writing to abide by.

128.   Activision has fully performed its obligations under the agreements and is not in breach of any covenants under the agreements.

129.   As a result of Defendants' multiple breaches of the agreements, Activision has suffered damages in an amount to be proven at trial.

130.   Additionally, unless and until Defendants are restrained from participating in a competing business and using property, ideas and Activision Proprietary Information, Activision will be permanently and irreparably harmed. Activision is therefore entitled to injunctive relief for Defendants' breaches, as previously agreed to by Tam, Yang and Fong as part of the Proprietary Information Agreement.

## EIGHTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty and Duty of Loyalty)

(Against Tam, Yang and Fong)

131.   Activision repeats, realleges and incorporates by reference, as though fully set out herein, the allegations contained in all preceding and subsequent paragraphs.

LAI-2841100v3

- 34 -

132.   As a result of the acts of Tam, Yang and Fong, Activision has been improperly deprived of its resources, property, opportunities and confidential information. Activision has thus been damaged in an amount to be determined at trial.

133.   The conduct of Tam, Yang and Fong was willful, malicious, fraudulent, and in conscious disregard of Activision's rights and interests, justifying an award of punitive damages.

## NINTH CLAIM FOR RELIEF

(Intentional Interference with Contractual Relations)

(Against TAC, Low, Yow, Reverb and Kennedy)

134.   Activision repeats, realleges and incorporates by reference, as though fully set out herein, the allegations contained in all preceding and subsequent paragraphs.

135.   As alleged *supra*, valid contracts exist between Activision and the Former Employees, which expressly obligate them to maintain the confidentiality of Activision's trade secrets and confidential information, and to not use such information in competition with Activision.

136.   Upon information and belief, Defendants TAC, Low, Yow, Kennedy and Reverb knew of the existence of the aforesaid agreements and of their operative provisions, but still conspired with the Former Employees to set up a competing business to Activision. In furtherance of those plans, Defendants TAC, Low, Yow, Kennedy and Reverb improperly and tortiously solicited, used, sent and received Activision Proprietary Information.

137.   TAC, Low, Yow, Kennedy and Reverb also intentionally acted to induce a breach of the contractual relationship between Activision and the Former Employees. Upon information and belief, Defendants TAC, Low, Yow, Kennedy

LAI-2841100v3

- 35 -

1    and Reverb contacted Tam, Yang and Fong to offer them a job for the purpose of

2    obtaining Activision Proprietary Information in violation of the Former Employees'

3    agreements with Activision.

4          138.   The improper acts of TAC, Low, Yow, Kennedy and Reverb resulted

5    in Tam, Yang and Fong breaching their contractual relationships with Activision.

6          139.   As a direct and proximate result of TAC's, Low's, Yow's, Kennedy's

7    and Reverb's interference with and inducement of the Former Employees to breach

8    their confidentiality and employment agreements, Activision has been damaged in

9    an amount to be proven at trial.

10          140.   TAC, Low, Yow, Kennedy and Reverb acted willfully, maliciously,

11    with an awareness of Activision's rights in its Proprietary Information and with the

12    express intent of using that information to cause Activision competitive injury.

13    Activision is therefore entitled to an award of punitive damages.

14

15                        **TENTH CLAIM FOR RELIEF**

16                (Interference with Prospective Economic Advantage)

17                  (Against TAC, Low, Yow, Kennedy and Reverb)

18          141.   Activision repeats, realleges and incorporates by reference, as though

19    fully set out herein, the allegations contained in all preceding and subsequent

20    paragraphs.

21          142.   An economic relationship existed between Activision and Tam and

22    Yang, with the probability that such relationship would result in a future economic

23    benefit to Activision during the term of the contract between Activision and these

24    former employees.

25          143.   Upon information and belief, Defendants TAC, Low, Yow, Kennedy

26    and Reverb knew of this relationship between Activision and Tam and Yang, and

27    intentionally acted to, and did in fact, disrupt the employment relationship between

28

LAI-2841100v3

1   these parties by inducing Tam and Yang to breach their employment agreements

2   with Activision and come to work for TAC and for the benefit of Lodestone.

3       144.   TAC, Low, Yow, Kennedy and Reverb induced Tam and Yang to

4   breach their employment agreements with Activision by, *inter alia*, terminating

5   their contractual relationship with Activision prior to the May 31, 2007 expiry of

6   their contracts and misappropriating Activision Proprietary Information to be used

7   by TAC, and by tortiously converting to themselves the benefits that Activision

8   would have otherwise received from the continued employment of Tam and Yang,

9   and the tortious use of Activision's Proprietary Information supplied to them by

10  Tam and Yang.

11      145.   TAC's, Low's, Yow's, Kennedy's and Reverb's improper acts

12  proximately caused economic harm to Activision in an amount to be determined at

13  trial.

14

15              **ELEVENTH CLAIM FOR RELIEF**

16  (California Statutory Unfair Competition – Cal. Bus. & Prof. Code § 17200, *et seq.*)

17              (Against All Defendants)

18      146.   Activision repeats, realleges and incorporates by reference, as though

19  fully set out herein, the allegations contained in all preceding and subsequent

20  paragraphs.

21      147.   By the conduct alleged above, Defendants have intentionally and

22  willfully engaged in unlawful, unfair and fraudulent methods of competition, and

23  unfair or deceptive acts or practices, in violation of Cal. Bus. & Prof. Code §

24  17200, *et seq.*

25      148.   Activision is informed and believes and thereon alleges that unless

26  restrained by this Court, Defendants will continue to infringe Activision's copyright

27

28

LAI-2841100v3

1    and use its trade secrets, and pecuniary compensation will not afford Activision

2    adequate relief for the damage caused by such actions.

3        149.    As a result of Defendants' acts complained herein, Activision has

4    suffered and will continue to suffer damage, and Defendants have been and will

5    continue to be unjustly enriched.

6

7    ### TWELFTH CLAIM FOR RELIEF

8    (Common Law Unfair Competition)

9    (Against All Defendants)

10       150.    Activision repeats, realleges and incorporates by reference, as though

11   fully set out herein, the allegations contained in all preceding and subsequent

12   paragraphs.

13       151.    Activision invested substantial time and money in development of the

14   Activision Proprietary Information.

15       152.    During the course of their employment with Activision, the Activision

16   Proprietary Information was conveyed to Tam, Fong and Yang in confidence.

17       153.    Tam, Fong and Yang voluntarily received the Activision Proprietary

18   Information with the understanding and knowledge that it was confidential, that it

19   was not to be disclosed to others, and that it was not to be used for purposes beyond

20   their duties as employees of Activision.

21       154.    Tam, Fong and Yang, in forming or agreeing to form Lodestone and in

22   communications with TAC, Low, Yow, Kennedy and Reverb, used and/or

23   disclosed the Activision Proprietary Information in breach of confidence.

24       155.    Upon information and belief, TAC, Low, Yow, Kennedy and Reverb

25   received and used the Activision Proprietary Information from Tam, Fong and/or

26   Yang with actual knowledge of their duty not to disclose it, or having reason to

27

28

1    know of their duty not to disclose it, or under circumstances giving rise to a duty to

2    inquire further regarding their obligations to Activision.

3        156.   Upon information and belief, Defendants received and used Activision

4    Proprietary Information at little or no cost.

5        157.   As a direct and proximate result of Defendants' acts, Activision has

6    suffered and continues to suffer damages, and Defendants have been unjustly

7    enriched.

8        158.   Defendants' conduct in this cause of action is willful, wanton,

9    malicious, oppressive, and in conscious disregard of the rights of Activision

10   justifying the imposition of punitive and exemplary damages under California Civil

11   Code Section 3294.

12

13                        **THIRTEENTH CLAIM FOR RELIEF**

14                                (Conversion)

15                          (Against Tam, Yang and Fong)

16       159.   Activision repeats, realleges and incorporates by reference, as though

17   fully set out herein, the allegations in all preceding and subsequent paragraphs.

18       160.   Activision is, and at all times herein was, the owner and possessor of

19   certain property, including but not limited to its proprietary and confidential

20   financial and marketing information, as well as its confidential software, hardware

21   and product design information.

22       161.   Activision is informed and believes that from October 2006 through

23   December 2006, the Former Employees, without Activision's consent or

24   authorization, knowingly and intentionally accessed and wrongfully took

25   Activision's property and caused injury to Activision, as more fully described

26   above.  These actions constitute conversion.

27

28

LAI-2841100v3

162.  As a result of Defendants' acts, Activision has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Activision respectfully demands judgment:

1.    That Defendants, their agents, servants, employees, attorneys, confederates and all persons acting for, with, by, through or in concert with them or any of them be enjoined preliminarily and permanently from:

(a)    copying, distributing, displaying or using any content derived or copied from the Guitar Hero™ or Guitar Hero II™ video game;

(b)    copying, distributing, displaying or using the Tam Demo and/or copying, distributing, displaying or using any content derived or copied therefrom;

(c)    manufacturing, selling, offering for sale, advertising or distributing Defendants' Game, the Tam Demo, or any rhythm based video game including or derived from any Activision Proprietary Information;

(d)    taking any steps to develop, market, manufacture, sell or distribute any rhythm based video game until after August 31, 2007;

(e)    using, disclosing, transferring, distributing or reproducing any Activision Proprietary Information and any materials or information derived therefrom, including but not limited to, using it in connection with developing a music or rhythm based game, or in starting a company, said Activision Proprietary Information including but not limited to:

- Financial information related to the Guitar Hero™ franchise, including but not limited to, profit and loss information, cost information, expenses, contract terms, sales numbers and forecasts, information contained in the Guitar Hero II™ Budget Summary, information contained in the Guitar Hero II™ North

LAI-2841100v3

- 40 -

1        American Xbox 360™ Strategy PowerPoint, information

2        contained in the Variable Sales & Marketing spreadsheet;

3    •  Marketing information related to the Guitar Hero™ franchise,

4        including but not limited to marketing partners, contract terms,

5        marketing categories, information contained in the Guitar

6        Hero™ franchise plans, identified growth areas for the Guitar

7        Hero™ franchise ,

8    •  Product information related to the Guitar Hero™ franchise ,

9        including but not limited to product design, such as the design

10       for the Guitar Hero II™ Xbox 360™ controller design, future

11       product ideas and designs,

12    •  Profit and loss statements developed by John Tam, Corey Fong

13       and/or Jamie Yang which were derived from Guitar Hero™

14       financial information, including such statements developed for

15       Hourglass Interactive and/or Lodestone Entertainment;

16    •  Information related to music licensing and in game advertising

17       for the Guitar Hero™ franchise , including but not limited to

18       contract terms, identities of possible future songs and artists to

19       include; and

20    •  Vendor information related to the Guitar Hero™ franchise ,

21       including but not limited to vendor identities and contact lists,

22       vendor pricing, and vendor contract terms.

23    (f)  taking any steps to develop, market, manufacture, sell or

24 distribute any guitar controller intended to be compatible with Activision's Guitar

25 Hero II™ game for the Microsoft Xbox 360™ game console for three months after

26 Activision commercially releases the Activision Guitar Hero II™ game for the

27 Microsoft Xbox 360™ game console.

28

1          (g)    disclosing, transferring, distributing, reproducing or using any of

2    the business plans developed by Jamie Yang, Corey Fong or John Tam or otherwise

3    derived from those individuals for Hourglass Interactive, Lodestone Entertainment

4    or TAC;

5          (h)    soliciting Activision employees, partners, distributors,

6    customers and/or vendors for a period of one year; and

7          (i)    unfairly competing with Activision in any manner.

8    2.    That Defendants be required to prepare and deliver to the Court a

9    complete list of entities to whom they distributed their plans for a guitar-based

10   video game, and to serve a copy of such list on Activision's attorneys.

11   3.    That Defendants be required to deliver up to Activision for

12   destruction all demos, packages, labels, literature, catalogs, signs, advertising

13   material and the like or any confusingly similar variations thereof related to

14   Defendants' Game.

15   4.    That Defendants be required to deliver to Activision any and all

16   materials obtained or derived from Activision.

17   5.    That Defendants, within thirty days after service of judgment with

18   notice of entry thereof upon it, be required to file with the Court and serve upon

19   Activision's attorneys a written report under oath setting forth in detail the manner

20   in which Defendants have complied with paragraphs 1 through 4, *supra*.

21   6.    That Defendants be required to account for and pay over to Activision

22   their profits and the cumulative damages sustained by Activision by reason of

23   Defendants' unlawful conduct herein alleged, that the amount of recovery be

24   increased as provided by applicable law, up to three times, and that interest and

25   costs be awarded to Activision.

26   7.    That the Court declare that Activision owns the copyright to

27   Defendants' Game and to all other software and hardware created by Tam, Yang

28   and Fong during their employment with RedOctane and Activision.

LA1-2841100v3

1      8.      That the Court order Defendants to pay statutory damages for willful

2   copyright infringement according to 17 U.S.C. § 504(c).

3      9.      That the Court order Tam, Yang and Fong to disgorge, forfeit and

4   restore to Activision the value of all direct and indirect compensation (including but

5   not limited to salary, bonuses, stock options, employer-paid insurance, profit-

6   sharing and pension contributions, etc.) received by them during their employment

7   with Activision between the dates when they began acting in breach of their duties

8   of loyalty to Activision until the dates when they departed the company.

9      10.     That the Court order disgorgement and/or restitution of Defendants'

10  profits to Activision.

11     11.     That the Court award restitution and the return of all material owned

12  by Activision that is in the Defendants' possession, custody or control.

13     12.     That Activision be awarded its reasonable costs and attorneys' fees.

14     13.     That Activision be awarded punitive damages.

15     14.     That Activision have such other and further relief as the Court may

16  deem equitable.

17

18  Dated:      January 18, 2007            JONES DAY

19

20                                         By:
                                              Michael A. Tomasulo

21                                         Attorneys for Plaintiff
                                           ACTIVISION PUBLISHING, INC.
22

23

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2      Pursuant to Fed.R.Civ.P. 38(b) and Local Rule 38-1, Plaintiff Activision, Inc.

3  hereby demands a trial by jury on all issues triable in this action.

4

5  Dated: January 18, 2007                    JONES DAY

6

7

8  By: _____

      Michael A. Tomasulo

9

   Attorneys for Plaintiff
10  ACTIVISION PUBLISHING, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAI-2841100v3

- 44 -



# EXHIBIT B



# EXHIBIT C



EXHIBIT D



# EXHIBIT E



EXHIBIT F



# EXHIBIT G



EXHIBIT H